# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Marash Gojcaj,

     Plaintiff,

     v.

City of Danbury, et al.,

     Defendants.

No. 3:14-cv-01739 (MPS)

## MEMORANDUM AND ORDER

Plaintiff Marash Gojcaj brings civil rights and common law claims against Defendants City of Danbury, Police Chief Alan Baker, and Detective Dan Trompetta that arise from the state's unsuccessful prosecution of him for witness tampering. Defendants have moved to dismiss Gojcaj's amended complaint in its entirety. (ECF No. 20.) Because certain counts asserted in the amended complaint are untimely and others fail to state a plausible claim for relief, I GRANT Defendants' motion to dismiss as to all but the Section 1983 claim for malicious prosecution. That claim is timely because, although subject to the same state statute of limitations as the other claims, it is governed by federal accrual rules, which are more forgiving in this context. Because Defendants have not otherwise challenged that claim, their motion to dismiss is DENIED with respect to Count One. As discussed below, however, they may file a supplemental brief directed at whether that claim is supported by sufficient factual allegations to state a plausible claim for relief.

## I.    Background

### A.    *Factual Allegations*

Gojcaj's amended complaint alleges the following facts. Between 2004 and 2010, Trompetta investigated the murder of Gojcaj's uncle, Zef Vulevic. (Am. Compl., ECF No. 17, ¶

15.)  In 2008, the State of Connecticut charged Gojcaj with Vulevic's murder.  (*Id.* at ¶ 16.)
Gojcaj pled not guilty and was released on bond on June 11, 2009.  (*Id.* at ¶¶ 17, 18.)  The
murder trial was scheduled to commence on September 7, 2010.  (*Id.* at ¶ 18.)

On September 1, 2010, Gojcaj was arrested, pursuant to a warrant, for tampering with the
state's trial witnesses.[1]  (*Id.* at ¶ 27.)  Trompetta had submitted an affidavit in support of the
arrest warrant.  (*Id.* at ¶ 19.)  In that affidavit, Trompetta stated the following: (1) Stephen Nanai,
a state witness in the murder trial, contacted Trompetta on June 16, 2009; Nanai informed
Trompetta that Gojcaj had contacted Nanai by telephone, and during that phone conversation,
Gojcaj asked to meet Nanai in person; (2) Nanai contacted Trompetta a few weeks later, and
informed Trompetta that Gojcaj had again contacted Nanai requesting an in-person meeting; (3)
Nanai reported to Trompetta that during that conversation, Gojcaj told Nanai that he wanted to
speak to Nanai about the murder trial, that Gojcaj had read Nanai's sworn statement to the
police, and that portions of that statement could be damaging for Gojcaj; Gojcaj asked Nanai
whether Nanai had embellished his statement to the police; (4) Nanai told Trompetta that he felt
that Gojcaj was attempting to sway his trial testimony; (5) Nanai provided a sworn written
statement regarding these telephone conversations with Gojcaj; in that statement, Nanai stated
that he and Gojcaj were "old friends," that the conversation was casual, included small talk, and
that Gojcaj never threatened Nanai and never made any requests of Nanai; (6) the same cell
phone Gojcaj used to contact Nanai was also used to contact other state witnesses; and (7)
Trompetta believed Gojcaj was attempting, unlawfully, to induce Nanai to alter his testimony.
(*Id.* at ¶ 20.)

---

[1] Conn. Gen. Stat. § 53a-151(a) states, "[a] person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding."

Trompetta knowingly omitted the following facts from his affidavit: (1) "most, if not all of the potential witnesses" Gojcaj contacted were friends, acquaintances, or business associates "with whom [Gojcaj] would naturally be expected to communicate"; (2) Gojcaj and Nanai casually communicated throughout 2009 and 2010; (3) Nanai was facing drug-related criminal charges when he informed Trompetta of Gojcaj's communications; (4) Nanai informed Trompetta of Gojcaj's communications with Nanai after "consulting with his wife who was a State Trooper, and after negotiating favorable treatment and a future letter of support from Trompetta and/or one or more" representatives of the State's Attorney's Office to the Pardon Board; and (5) Nanai provided his written statement in exchange for Trompetta's promise that he and representatives from the State's Attorney's Office would submit those letters to the Pardon Board.  (*Id.* at ¶ 21.)  Trompetta omitted these facts in order to mislead the judge reviewing the warrant application.  (*Id.* at ¶¶ 22, 23.)  Trompetta did so with the intent of "placing a general chilling effect" on Gojcaj, and in order to interfere with Gojcaj's ability to defend himself in the murder trial.  (*Id.* at ¶ 26.)

Gojcaj was arraigned on September 2, 2010, and pled not guilty to the tampering charge.  (*Id.* at ¶ 28.)  The presiding judge set Gojcaj's bond at $500,000.00.  (*Id.*)  Gojcaj could not post the required amount and, as a result, remained incarcerated throughout the subsequent proceedings relating to his murder and tampering charges, which were tried separately.  (*Id.* at ¶ 29.)  Incarceration hindered Gojcaj's ability to assist his counsel in his murder defense, at least in part because communicating with his counsel became "virtually impossible."  (*Id.* at ¶ 30.)  Gojcaj could not sleep during his murder trial because he was constantly being transported to and

from the courthouse.  (*Id.* at ¶ 32.)  The jury convicted Gojcaj on his murder charge on

November 5, 2010,[2] and Gojcaj was sentenced to 50 years imprisonment.  (*Id.* at ¶ 34.)

Gojcaj hired counsel to represent him in defending the witness tampering charge.  (*Id.* at

¶ 33.)  The State's Attorney's Office offered Gojcaj a plea deal of no more than five years

imprisonment to run consecutively to his murder sentence.  (*Id.* at ¶ 34.)  This plea offer was less

favorable in comparison to "similarly situated criminal defendants charged with Tampering at or

around the same time."  (*Id.*)  Gojcaj rejected the government's offer.  (*Id.*)

During the tampering trial, Trompetta insisted on "continued prosecution" and "a

disposition that involved a maximum sentence to run consecutively" to Gojcaj's murder

sentence, provided "incentives and encouragement" to Nanai in exchange for his testimony at the

tampering trial, and "continued with the [s]tate [p]rosecutors to withhold exculpatory and/or

significant impeachment type evidence."  (*Id.* at ¶ 35.)  Nanai and Trompetta testified at the

tampering trial and maintained the version of events described in Trompetta's affidavit.  (*Id.* at

¶¶ 36, 37.)  During the trial, Nanai testified that he informed Trompetta that Gojcaj never

threatened him or asked Nanai to alter his testimony, and that the conversations were casual and

friendly.  (*Id.* at ¶¶ 38, 39.)  Nanai also testified that Trompetta wrote a letter in support of a

pardon for his drug convictions prior to Nanai's testifying at the tampering trial.  (*Id.* at ¶ 40.)

The trial court ordered the government to release to Gojcaj any impeachment evidence relating to

Nanai and Trompetta.  (*Id.*)  As a result, Gojcaj learned that a representative of the State's

Attorney's Office had "discussions" with Nanai about assisting him in his pardon application

---

[2] The Amended Complaint does not state the actual date on which Gojcaj was convicted of murder.  Nonetheless, this Court may take judicial notice of filings in other litigation.  *See, e.g.*, *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish a fact of such litigation and related filings.").  Defendants attached the case information sheet from Gojcaj's murder trial to their motion to dismiss.  (ECF No. 21.)  The case sheet indicates that Gojcaj was convicted on the murder charge on November 5, 2010.  Gojcaj does not dispute this date in his briefing.

before he testified in Gojcaj's murder and tampering trials.  (*Id.* at ¶ 41.)  This was the first time Gojcaj and his counsel learned of Trompetta's and the State's Attorney's Office's involvement with Nanai's pardon application.  (*Id.* at ¶ 42.)  The jury acquitted Gojcaj of tampering on November 20, 2011.[3]  (*Id.* at ¶ 45.)

Trompetta attended the entire tampering trial including jury selection.  (*Id.* at ¶ 43.) During the trial, Trompetta "made gestures, whispered remarks, and laughed during closing arguments with intent [to] intimidate" Gojcaj and influence the jury.  (*Id.* at ¶ 44.)  Upon hearing the verdict of acquittal, Trompetta stated "it's not over," and made other "derogatory and inflammatory comments directed at undermining the validity of the verdict."  (*Id.* at ¶ 46.) Throughout both trials, Trompetta – either himself or "via solicited aid from other members of Danbury [Police Department]" – pulled over Gojcaj and his family members in pretextual traffic stops, followed Gojcaj's family members as they drove to and from the courthouse, and affixed and removed a satellite tracking device on at least one vehicle registered to Gojcaj or one of his family members.  (*Id.* at ¶ 44.)  Gojcaj also alleges that Trompetta (or other Danbury officers acting under his orders) "unlawfully enter[ed] the State of New York" to affix or remove the tracking device(s) without legal authority to do so.  (*Id*. at ¶ 44(e).)

### B. *Procedural Posture*

Gojcaj filed a complaint against Defendants on November 20, 2014, asserting eight counts.  The complaint asserted claims against Trompetta in his individual and official capacities, Chief Baker, in his individual and official capacities, and the City of Danbury.  On April 10, 2015, Defendants filed a motion to dismiss, arguing that Gojcaj's claims were time-barred, and in the alternative, failed to state a claim for relief.  (ECF No. 12.)  On May 26, 2015,

---

[3] Gojcaj does not state the date of acquittal in the Amended Complaint, but the parties do not dispute in their memoranda that this date is correct.

Gojcaj simultaneously filed a memorandum in opposition to Defendants' motion to dismiss (ECF No. 16 ("First Obj. Mem.")) and an amended complaint (ECF No. 17).  Because Gojcaj filed an amended complaint in response to the motion to dismiss, the Court denied Defendants' motion to dismiss without prejudice.  (ECF No. 18.)  On June 16, 2015, Defendants filed a second motion to dismiss (ECF No. 20), which I now address.  On July 24, 2015, Gojcaj filed a memorandum in opposition to Defendants' second motion to dismiss.[4]  (ECF No. 27 ("Second Obj. Mem.").)

## II.    Discussion

The Amended Complaint asserts six counts.  The first five counts assert claims against Trompetta in his individual and official capacities: (1) malicious prosecution under the Fourth and Fourteenth Amendments, (2) malicious prosecution in violation of Article One, Sections Seven and Nine, of the Connecticut Constitution, (3) abuse of process, (4) intentional infliction of emotional distress, and (5) malicious prosecution under Connecticut common law.  Count Six asserts a claim of supervisory and municipal liability against Chief Baker and the City of Danbury for violations of Gojcaj's federal constitutional rights.  In their motion to dismiss, Defendants argue that each count is untimely, and in the alternative, fails to state a claim for relief.

### A.   *Legal Standard*

A motion to dismiss tests the sufficiency of a claimant's pleadings.  In considering a motion to dismiss, this Court must take Gojcaj's "factual allegations to be true and [draw] all reasonable inferences in" his favor.  *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state

---

[4] On June 16, 2015, Defendants filed an "Objection" to Gojcaj's Amended Complaint.  (ECF No. 19.)  In that objection, Defendants argue (1) Gojcaj's amendments should not be permitted because they assert new facts not derived from the original complaint, and (2) amendment is futile.  Because I deny Defendants' motion to dismiss only as to Count One, which was not significantly altered in the Amended Complaint, I need not address Defendants' objection.

a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citation and internal quotation marks omitted).  The plausibility standard "does not impose a

probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence" supporting the claim for relief.  *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 556 (2007).  "Although a court must accept as true all of the

allegations contained in a complaint, this tenet is inapplicable to legal conclusions.  Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice."  *Sikhs for Justice, Inc. v. Gandhi*, 614 Fed. App'x 29, 30 (2d Cir. 2015) (citation and

internal quotation marks omitted).

### B. *Malicious Prosecution (Counts One, Two, and Five)*

Gojcaj asserts a malicious prosecution claim under three legal theories: violation of the

Fourth and Fourteenth Amendments to the United States Constitution (Count One), Article One,

Sections Seven and Nine, of the Connecticut Constitution (Count Two), and Connecticut

common law (Count Five).  I dismiss Counts Two and Five because they are untimely, and deny

the motion to dismiss as to Count One because it is timely and because Defendants' argument

that Count One fails to state a claim is not persuasive.

As an initial matter, I note that Counts One and Two do not expressly identify themselves

as claims of malicious prosecution.  Count One asserts that Trompetta violated Gojcaj's Fourth

Amendment right (under the Federal Constitution) "to be free from unreasonable and unlawful

detentions, arrests and seizures, and to hinder his ability to defend himself against criminal

charges," (Am. Compl., Count One[5] ¶ 48), and Count Two asserts that Trompetta violated

---

[5] The Amended Complaint contains a typographical error.  Rather than numbering the paragraphs sequentially, every count listed in the Amended Complaint begins with "Paragraph 48."  In order to avoid citation ambiguity, I cite any language found in the causes-of-action section of the Amended Complaint according to the format "Count ___ ¶ ___."

Gojcaj's rights under Article One, Sections Seven and Nine, of the Connecticut Constitution "to be free from unreasonable and unlawful detentions, arrests[,] and seizures" (*id.* at Count Two ¶ 48). But Gojcaj's memoranda disavow any false arrest claims and make clear that he wishes to present these counts as malicious prosecution claims only. For example, in response to Defendants' argument that the first two counts are untimely, Gojcaj states,

> First and foremost, Defendants consistently and erroneously refer to Plaintiff's claims as 'false arrest' claims. However, the Complaint and the Amended Complaint on their face clearly indicate that these claims are based on malicious prosecution and not false arrest. As pled, the facts fall neatly into the realm of malicious prosecution, which is a "deprivation of liberty" effected pursuant to legal process. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir.1995). . . . Consequently, the counts should be analyzed as § 1983 claims for malicious prosecution under the Fourth Amendment and not as "false arrest" claims.

(First Obj. Mem., at 2–3.) This language is placed in a section of the memorandum labeled "42 U.S.C. §1983 and State Constitutional Tort Counts," referencing "Counts One, Two and Six of the Amended Complaint." (*Id.* at 2 & n.1.) Throughout his briefs, Gojcaj treats Counts One and Two as identical. (*See* First Obj. Mem., at 2–4, 7–8; Second Obj. Mem., at 2–4, 8.) As a result, I consider Counts One and Two to assert malicious prosecution claims under the Federal Constitution and Connecticut Constitution, respectively.

### i.     Timeliness

Defendants argue that the malicious prosecution claims are time-barred. "While a statute of limitations defense is not ordinarily considered on a motion to dismiss, it is appropriate if the dates in question are undisputed." *Pinkston v. Connecticut*, No. 09-cv-633-JCH, 2009 WL 2852907, at *2 (D. Conn. Sept. 2, 2009). The parties do not dispute the dates relevant to Gojcaj's claims, and those dates, to the extent not pled, are judicially noticeable from court filings. *Int'l Star Class Yacht Racing Ass'n*, 146 F.3d at 70. As discussed below, the applicable

8

statute of limitations for all three claims is three years.  Gojcaj filed this lawsuit on November

20, 2014.  Thus, any malicious prosecution claim Gojcaj asserts must have accrued (*i.e.*, the

statute of limitations must have started to run) no earlier than November 20, 2011.  As explained

below, the accrual dates differ between the federal and state law malicious prosecution claims.

Gojcaj's state law malicious prosecution claims, which accrued prior to the federal claim, are

untimely.  The federal law claim, however, is timely.

Section 1983, which does not set forth a limitations period, "borrows" its statute of

limitations from "the most appropriate or analogous state statute of limitations."  *Assegai v.*

*Bloomfield Bd. of Ed.*, 165 Fed. App'x 932, 934 (2d Cir. Feb. 7, 2006).  In Connecticut, the

appropriate limitations period for a Section 1983 claim is three years under Conn. Gen. Stat. §

52-577.  *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) ("[Conn. Gen. Stat.] § 52-577

should have been applied to plaintiffs' claims under § 1983."); *Dontigney v. Paramount Pictures*

*Corp.*, 411 F. Supp. 2d 89, 91 (D. Conn. 2006) ("In Connecticut, the limitations period for filing

an action under 42 U.S.C. § 1983 is three years." (citation omitted)).  Claims under Article One,

Sections Seven and Nine, are also limited by Conn. Gen. Stat. § 52-577, *see, e.g.*, *Quick Power*

*Intern. Corp. v. City of Danbury*, No. CV-980333218-S, 2001 WL 420575, at *2 (Conn. Super.

Ct. April 11, 2011) ("The court, therefore, finds that § 52-577 is the applicable statute of

limitations for the plaintiff's claims of . . . [claims] under the United States Constitution *and*

Connecticut Constitution . . ."), as are common law malicious prosecution claims, *see, e.g.*,

*Windels v. Hart Inc. Props.*, No. CV-085019114, 2010 WL 745807, at *1 (Conn. Super. Ct. Feb.

1, 2010).  The parties do not dispute that Conn. Gen. Stat. § 52-577 governs all three malicious

prosecution claims.

Despite sharing a statute of limitations provision, Section 1983 and state law claims differ as to the date on which the statute of limitations begins to run.  For Section 1983 claims, federal law, not state law, determines the accrual date of a claim.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("While we have never stated so expressly, the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." (emphasis in original)).  Under federal law, "it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action."  *Id.* (citation and internal quotation marks and alterations omitted).  In contrast, the accrual date for state law claims governed by Conn. Gen. Stat. § 52-577 follows an "occurrence" rule:

> In construing [Section 52-577], which allows an action to be brought within three years from the date of the act or mission complained of, we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred.

*Fichera v. Mine Hill Corp.*, 207 Conn. 204, 211 (1988) (citation and internal quotation marks omitted).  "Section 52-577 is a statute of repose in that it sets a fixed limit after which the [defendant] will not be held liable and in some cases will serve to bar an action before it accrues."  *Sanborn v. Greenwald*, 39 Conn. App. 289, 302 (1995) (citations and internal quotation marks omitted).  "With such [occurrence] statutes, the limitation period typically begins to run as of the date the complained of conduct occurs, and not the date when the plaintiff first discovers his injury."  *Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 311 (2014) (citation omitted).  In certain cases, then, the statute of limitations applicable to a Connecticut law malicious prosecution claim may begin to run before the same statute of limitations would begin to run for a Section 1983 malicious prosecution claim based on the same facts.  This is such a case.

Gojcaj's federal malicious prosecution claim is not time-barred.  To prevail in a Section 1983 malicious prosecution claim in Connecticut, Gojcaj must show

> a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law.  In Connecticut, the elements of a malicious prosecution claim are that (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.

*Turner v. Boyle*, No. 3:13-cv-616-SRU, 2015 WL 4393005, *16 (D. Conn. July 15, 2015) (citations and internal quotation marks omitted).  The statute of limitations does not begin to run on a federal malicious prosecution claim until the claimant obtains favorable termination.  *See id.* ("A Section 1983 claim for malicious prosecution accrues when criminal proceedings have terminated in the plaintiff's favor." (citation and internal quotation marks omitted)).  Gojcaj was acquitted of witness tampering on November 20, 2011.  The statute of limitations for Gojcaj's Section 1983 malicious prosecution claim with respect to his tampering charge therefore began to run on November 20, 2011.  Because Gojcaj filed this lawsuit within three years of that date, the federal claim survives the statute of limitations.

In contrast, the statute of limitations for the state law malicious prosecution claims began to run prior to November 20, 2011, because Trompetta's alleged wrongful conduct occurred prior to that date.  As stated, under Conn. Gen. Stat. § 52-577, a state law claim accrues when the defendant engages in the wrongful conduct.  The court in *Windels v. Hart Inc. Props.*, No. CV-08-5019114, 2010 WL 745807 (Conn. Super. Ct. Feb. 1, 2010), was presented with a similar question – whether the statute of limitations for a state law vexatious litigation claim begins to

run upon favorable termination or upon the filing of an action without probable cause.[6]  The

plaintiff argued that the three-year limitations period did not begin to run until the "underlying

litigation terminated in the plaintiff's favor."  *Id.* at *1.  The defendants responded that the

limitations period ran upon the "occurrence" of the malicious prosecution, which was the

commencement of the civil action against the plaintiff without probable cause.  The court agreed

with the defendants, explaining that, as an "occurrence" statute of limitations, Section 52-577 ran

upon the commencement of the defendant's unlawful action.  In the malicious prosecution

context, that date will normally be the initiation of the prosecution without probable cause.  The

court noted, "Section 52-577 does not concern the date a cause of action accrued and in fact, it

may work to preclude an action even before it accrues."  *Id.* at *4 (citation and internal quotation

marks omitted).  Construing Gojcaj's allegations in the light most favorable to him, Trompetta's

unlawful action occurred, at the latest, on September 1, 2010, the date that Trompetta's actions

caused Gojcaj to be arrested for witness tampering.  Because the state law claim accrued prior to

November 20, 2011, Counts Two and Five exceed the applicable statute of limitations and are

untimely.

Gojcaj argues his state law claims are not time-barred, asserting that "it is now well

settled law in the state of Connecticut that a cause of action for malicious prosecution does not

accrue until Plaintiff achieves a successful termination of proceedings in his favor."  (Pl.'s

Second Obj., ECF No. 27, at 4).  For this proposition, Gojcaj cites *Lopes v. Farmer*, 286 Conn.

384, 390 (2008).  *Lopes*, however, dealt only with a claim of malicious prosecution under

Section 1983.  *See id.* at 385 ("In this action for malicious prosecution brought pursuant to 42

U.S.C. § 1983 . . .."); *see also Washington v. Boyle*, 113 Conn. App. 131, 134 (2009) ("In *Lopes*,

---

[6] "The elements of the torts of malicious prosecution and vexatious litigation are identical . . . The difference is that malicious prosecution is based on a former criminal prosecution, while the vexatious litigation is based on a prior civil action.  *Id.* at *3 (citations and internal quotation marks omitted).

the plaintiff filed an action, pursuant to 42 U.S.C. § 1983, for malicious prosecution . . .").  The court in *Lopes* never addressed the accrual date of a state law malicious prosecution claim, and specifically noted the possibility of a different analysis had the malicious prosecution claim been brought under state law.  *See id.* at 390 n.6 ("Because [*Wallace*] held that questions of accrual is a question of federal, rather than state law, the defendants' arguments, which rely on state law principles, that is, the fact that § 52-577 is an occurrence statute; see [*Fichera*]; are unavailing."). The remaining cases that Gojcaj cites in support of this argument, *Heck v. Humphrey*, 215 U.S. 477, 484 (1994), and *Turner*, 2015 WL 4393005, at *16, 22, also address solely federal malicious prosecution claims. [7]

Defendants' motion to dismiss is GRANTED as to Counts Two and Five because those claims are untimely.  I address next Defendants' claim that Gojcaj's allegations fail to state a claim for relief in Count One, which is not barred by the statute of limitations.

### ii.    Sufficiency of Allegations

Defendants' only contention challenging the sufficiency of the allegations supporting Count One is that Gojcaj fails to state a claim because he "has been incarcerated since November 5, 2010, following his conviction on a charge of murder."  (ECF No. 20-1, at 15.)  In other words, Defendants argue that Gojcaj cannot assert a malicious prosecution claim if, at the time the claim accrued, he was incarcerated on an unrelated charge.  It is true that "[a] plaintiff does not state a claim for either false arrest or malicious prosecution under section 1983 if, at the time of his arrest and prosecution, he is already in custody or incarcerated on other charges, because there is no deprivation of his or her liberty interests."  *Johnson v. Leger*, No. 3:07-cv-128-WWE,

---

[7] It is worth noting that on page 22 of *Turner*, the court did address a state law malicious prosecution claim, stating, "[a] claim for malicious prosecution, however, accrues only after the underlying action terminates in the plaintiff's favor."  I disagree with the *Turner* court's analysis in this respect, however, because in support of that proposition, the court cited *Lopes*. *Id.*  As stated, *Lopes* addressed only a malicious prosecution claim under Section 1983.  It did not address the accrual date of a state malicious prosecution claim under Conn. Gen. Stat. § 52-577.

2009 WL 902384, at *8 (D. Conn. Mar. 31, 2009) (citing *Holmes v. Grant*, No. 03-cv-3426,

2006 WL 851753, at **13-14 (S.D.N.Y. Mar. 31, 2006) ("An inmate already incarcerated has

not suffered any unconstitutional deprivation of liberty as a result of being charged with new

criminal offenses.")).  But according to Gojcaj's allegations, his injury resulting from

Trompetta's malicious prosecution occurred prior to the date of his murder conviction.  Gojcaj's

injury in this context began when he was arrested on the tampering charge on September 1, 2010.

At that time, Gojcaj was not incarcerated.  He had posted bond on his murder charge and was

released on June 11, 2009.  (Am. Compl. ¶ 18.)  Only after his arrest for tampering was Gojcaj

incarcerated.  Thus, during the period September 2, 2010, to November 5, 2010 (the date he was

convicted on the murder charge), Gojcaj was incarcerated as a result of the allegedly malicious

tampering prosecution.

Defendants seem to argue that, because Gojcaj's injury occurred prior to the accrual date

of his malicious prosecution claim, he cannot state a claim because no injury occurred during the

statute of limitations period.  (*See* Mtn. to Dismiss, ECF No. 20-1, at 8–9, 15–16.)  This just

restates Defendants' argument on the statute of limitations issue.  Accepting this argument would

make it impossible for a plaintiff to prevail on any federal malicious prosecution claim in which

the confinement occurred outside the limitations period but the favorable termination occurred

inside that period.  As stated above, the accrual date for such a claim is the date of favorable

termination, and the injury will nearly always end on or before that day.  It would abrogate the

rule that the accrual date for a Section 1983 malicious prosecution claim is the date of favorable

termination to adopt the Defendant's position.

Because Defendants present no other argument in support of their contention that Gojcaj fails to state a claim for malicious prosecution under federal law, Defendants' motion is DENIED as to Count One.

### C. *Abuse of Process (Count Three)*

Defendants argue that Gojcaj's abuse of process claim is untimely and, in the alternative, his allegations fail to state a claim for relief. I agree that Gojcaj's abuse of process claim is untimely and dismiss Count Three.

Gojcaj's abuse of process claim is also limited by Conn. Gen. Stat. § 52-577. *See, e.g.*, *Timbers v. Updike, Kelly & Spellacy, P.C.*, 83 Conn. App. 442, 226 (2004) (ruling the plaintiff's abuse of process claim untimely because it exceeded the three-year limitation set forth in Conn. Gen. Stat. § 52-577). Because Gojcaj asserts abuse of process under state law, the three-year statute of limitations began to run on this claim on the "date of the act or omission complained of." Conn. Gen. Stat. § 52-577.

Under Connecticut law, Trompetta is liable for abuse of process if he used:

> a legal process against another in an improper manner or to accomplish a purpose for which it was not designed. Because the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the Restatement Second (1977) of Torts, § 682, emphasizes that the gravamen of the action for abuse of process is the use of a legal process . . . against another *primarily* to accomplish a purpose for which it is not designed . . . . Comment b to § 682 explains that the addition of primarily is meant to exclude liability when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant.

*Larobina v. McDonald*, 274 Conn. 394, 403–04 (2005) (citations omitted) (emphasis in original). Gojcaj contends that Trompetta abused the judicial process in pursuit of five improper purposes: (1) "to intimidate, discourage and prevent [Gojcaj] from defending himself in his pending murder trial," (2) "to intimidate, discourage and prevent [Gojcaj] from defending himself in his

pending tampering trial," (3) "to retaliate against [Gojcaj] for electing to proceed to a jury trials [sic] where he could cross examine the witnesses against him, including [Trompetta]," (4) "to interfere with and/or prevent [Gojcaj] from effectively communicating with his trial counsel during the pendency of his murder trial; and to thwart [Gojcaj's] efforts to defend himself and to place a chilling effect on him throughout his trials," and (5) "to otherwise scare and/or intimidate [Gojcaj] and place a chilling effect upon [his] exercise of [c]onstitutional rights." (Am. Compl. Count Three ¶ 49.)

With respect to the first and fourth purposes just listed, the abuse of process claim is clearly time-barred. Gojcaj was convicted of murder on November 5, 2010. If the purpose of Trompetta's abuse of judicial process was to harm Gojcaj's murder defense, that abuse ended, at the latest, on November 5, 2010. Because that date is more than three years before Gojcaj filed this suit, those abuse of process theories cannot proceed.

Under the second, third, and fifth theories of abuse of process, Trompetta's abuse began, at the latest, on September 1, 2010 – the date Trompetta's affidavit commenced Gojcaj's prosecution. The claim therefore exceeds the statute of limitations. Gojcaj argues, however, that the "continuing course of conduct" doctrine should toll the statute of limitations until the date of his acquittal, November 20, 2011. This would render the claim timely. According to Gojcaj, Trompetta "did not end his campaign of intimidation and misconduct after swearing an affidavit in support of an arrest warrant. . . . [H]e continued to participate in the ongoing prosecution, seeking to influence the outcome of the matter to Plaintiff's detriment." (Second Obj. Mem., at 6.) I reject this argument because Gojcaj's factual allegations fail to satisfy the continuing course of conduct doctrine.

16

Gojcaj is correct that if Trompetta engaged in "later wrongful conduct" that is "related to" earlier abuses of process and if that later wrongful conduct satisfies the elements of abuse of process, the statute of limitations may be tolled to save his claim. *See Sherwood v. Danbury Hospital*, 252 Conn. 193, 204–05 (2000) (for the continuing course of conduct doctrine to apply, "there must be evidence of the breach of duty that remained in existence after commission of the original wrong related thereto. This court has held this requirement to be satisfied when there was wrongful conduct of a defendant related to the prior act" (citations and internal quotation marks omitted)). Even if Trompetta's initiation of the tampering charge satisfied the elements of abuse of process, however, Gojcaj's allegations of Trompetta's later conduct do not satisfy the continuing course of conduct doctrine in a manner that could render his abuse of process claim timely. The complaint alleges no later, related wrongful conduct amounting to abuse of process on or after November 20, 2011. Only two aspects of Trompetta's conduct could be construed to have occurred on or after November 20, 2011, and neither amounts to abuse of process. First, Trompetta "was present in the courtroom, made gestures, whispered remarks and laughed during closing arguments with the intent [to] intimidate the plaintiff and/or influence the jury." (Am. Compl. ¶ 43.) It is possible that some of this conduct occurred on November 20, 2011, before the jury reached its verdict. This conduct does not amount to abuse of process, however, because it does not involve the judicial process. An alleged "abuse" of process must involve utilization of judicial authority. *See, e.g.*, *Larobina v. McDonald*, 274 Conn. 394, 406–07 (2005) (requiring an abuse of process claimant to prove "that the defendant used a *judicial process*" (emphasis in original)); *cf. Stolz v. Wong Comm'ns Ltd. P'ship*, 25 Cal. App. 4th 1811, 1822 (1994) ("The essence of the tort 'abuse of process' lies in the misuse of the power of the court; it is an act done in the name of the court and under its authority for the purpose of perpetrating an injustice."

(citations and alterations omitted)).[8]  Trompetta's alleged actions during the tampering trial, while potentially disruptive and distracting for those in the courtroom, cannot be construed as utilizing judicial authority.  Those actions, as alleged, did not involve the "judicial process."

The other conduct alleged in the Amended Complaint that could have occurred on November 20, 2011, or later, is the various intimidating and harassing actions Trompetta and other Danbury police officers allegedly took against Gojcaj and his family, such as having Gojcaj and his family members pulled over on pretextual grounds, following Gojcaj's family while they drove to and from the courthouse, and affixing satellite tracking devices on vehicles registered to Gojcaj and his family.  (Am. Compl. ¶ 44.)  Again, even if this conduct occurred on November 11, 2011, or later, it cannot amount to abuse of process because it does not involve a use of judicial process.  Engaging in surveillance and traffic stops are executive, not judicial, actions.  *Cf. Spector v. Bd. of Trustees of Cmty.-Tech. Colls.*, No. 3:06-cv-129-JCH, 2007 WL 4800726, *13 (D. Conn. Dec. 27, 2007) ("Neither a failure to investigate nor surveillance constitutes a 'legal process' for the purposes of an abuse of criminal process claim.").  Because this alleged conduct does not meet the requirements of an abuse of process claim, it cannot amount to a continuing course of conduct that would toll the statute of limitations.  Count Three is DISMISSED because it is untimely.

### D.  Intentional Infliction of Emotional Distress (Count Four)

Defendants argue that Gojcaj's fourth count against Defendant Trompetta, intentional infliction of emotional distress ("IIED"), is time-barred and fails to state a claim for relief.

---

[8] Gojcaj argues his detention as a result of the tampering charge satisfies this judicial process requirement.  (Second Obj. Mem., at 10–11.)  This was true, but only until November 5, 2010, when the intervening event of Gojcaj's murder conviction replaced the tampering charge as the proximate cause of his incarceration.  During the statute of limitations period, Gojcaj was incarcerated because of his murder conviction, not the tampering charge.

Because I find that the Amended Complaint fails to state a claim for IIED, I do not address the timeliness issue.

Under Connecticut law, a plaintiff claiming IIED must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Stonington*, 254 Conn. 205, 210 (2000) (citation and internal quotation marks omitted). "Liability has been found only when the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 210–11.

Gojcaj lists five aspects of Trompetta's conduct that he argues were extreme and outrageous: (1) "providing misleading information in his affidavit in support for an arrest warrant with the purpose of harassing Plaintiff and interfering with his murder trial," (2) "testifying against Plaintiff in the same manner as set forth in his affidavit," (3) "influencing the criminal case against the Plaintiff behind the scenes, and engaging in courtroom intimidation of Plaintiff," (4) "trying to influence the jury during the Plaintiff's trial," and (5) "enlisting other police officers to further harass and intimidate the Plaintiff and his family during Plaintiff's trial." (Second Obj. Mem., at 12.) Gojcaj alleges that Trompetta's actions were "done and made maliciously, intentionally, willfully or knowingly and with the purpose of causing [Gojcaj] severe emotional distress," and were "extreme, outrageous, and atrocious, and intolerable in civilized society." (Am. Compl. Count Four ¶¶ 48, 49.) As a result of those actions, Gojcaj alleges he "suffered severe emotional distress, humiliation, embarrassment, fear, loss of appetite,

loss of sleep, depression and loss of enjoyment and quality of life." (*Id.* at ¶ 50.) Defendants argue that Gojcaj fails to state a claim for IIED because the alleged conduct does not rise to the level of "extreme and outrageous."

I agree that none of the aspects of Trompetta's conduct listed above amount to extreme or outrageous conduct. The first, providing misleading information in a warrant affidavit, could – in the abstract – be considered extreme or outrageous. But within the context of the facts alleged, Trompetta's conduct does not reach this threshold. Gojcaj does not allege that any of the statements in Trompetta's affidavit were untrue. Gojcaj argues instead that Trompetta omitted material information from the affidavit in an effort to mislead the judge reviewing the warrant application. According to the allegations, Trompetta omitted three facts from his affidavit: (1) the witnesses that Gojcaj contacted were friends, acquaintances, or business associates, and that Gojcaj spoke to Nanai often between 2009 and 2010, (2) Nanai gave his statement to Trompetta after consulting with his wife, a State Trooper, and negotiating favorable treatment with regard to felony drug charges pending against him, and (3) Nanai's veracity was questionable given his "quid pro quo" deal with law enforcement. (Am. Compl. ¶ 21.)

These were not material omissions. As to the first omission, Trompetta stated in his affidavit that Nanai and Gojcaj were "old friends" and that the conservation between them was "casual," involved "small talk," and Gojcaj never threatened him in any way. (*Id.* at ¶ 20(e).) This significantly mitigates the materiality of Trompetta's omission from the affidavit that Gojcaj and Nanai spoke casually between 2009 and 2010. While Trompetta did not state in the affidavit that the other witnesses Gojcaj contacted were friends, acquaintances, or business associates, that omission made little difference because the affidavit focused almost solely on Gojcaj's communications with Nanai. The statement in the affidavit mentioning other witnesses

was that Gojcaj used the same phone he used to call Nanai to contact other witnesses.  The omission regarding Gojcaj's relationship with other witnesses certainly did not threaten the propriety of the probable cause determination.

Further, while relevant to his credibility as an informant, the fact that Nanai was promised assistance in his pardon application in exchange for a written statement against Gojcaj is also insufficiently significant to threaten the probable cause determination.  In the context of a criminal defendant challenging an arrest warrant, courts have considered similar omissions insufficient to justify a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  *See, e.g.*, *United States v. Milton*, 153 F.3d 891, 896 n.3 (8th Cir. 1998) (affirming denial of *Franks* hearing when affiant omitted the fact that the informant was paid for the information provided, "because these statements and omissions do not rob the affidavit of its ability to provide probable cause"); *United States v. Case*, No. 3:06-cr-210-WHB-JCS, 2008 WL 2002517, *5 (S.D. Miss. May 6, 2008) ("[W]hile the omitted financial information may have bearing on the credibility of the [informant], and thus may have affected the probable cause determination, there has been no showing that it would have precluded a finding of probable cause . . .").  Trompetta's omission of this information, while perhaps less than proper, simply was not conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  *Cf. Pines v. Bailey*, No. 3:10-cv-866-MRK, 2012 WL 2958213, *7 (D. Conn. July 19, 2012) *rev'd on other grounds* 563 Fed. App'x 814 (2d Cir. 2014) ("As a matter of law, the Court cannot find that the omissions and errors in Detective Bailey's [warrant] affidavit – important as they may have proved to be – constitute the kind of conduct [sufficiently outrageous to prove an IIED claim].").

In light of my conclusion that the omissions in Trompetta's affidavit were not material, it appears that Gojcaj may have failed to state a claim for malicious prosecution in Count One

because the allegations in the Amended Complaint at least arguably fail to suggest that Trompetta initiated the tampering prosecution without probable cause.  Defendants, however, did not assert this argument in their briefs.  To spare the parties potentially unnecessary litigation costs, and to afford them a fair opportunity to be heard, I will allow them to submit further briefing on this issue.  Within twenty-one days of this ruling, Defendants may submit a memorandum, no more than ten pages, as to whether the Amended Complaint fails to state a plausible claim for relief in Count One because it fails to suggest that Trompetta lacked probable cause of Gojcaj's guilt when he signed the warrant affidavit.  If Defendants submit such a memorandum, Gojcaj may submit a response, also limited to ten pages, no more than twenty-one days following Defendants' submission.  No reply memoranda may be submitted.

The second alleged conduct, testifying against Gojcaj in his tampering trial in accordance with his affidavit, is neither extreme nor outrageous.  Gojcaj does not allege that Trompetta perjured himself while testifying in the tampering trial, but rather that Trompetta omitted the same information from his testimony as in the affidavit.  But any such omission from Trompetta's testimony was the result of the trial attorneys' failure to ask him questions regarding those facts.  Trompetta cannot be held liable for failing to testify to a fact about which he was never questioned.

Third, Gojcaj alleges that Trompetta influenced the tampering case "behind the scenes." The Amended Complaint offers the following facts to support this assertion: (1) Trompetta insisted on the continued prosecution and a maximum sentence running consecutive to the murder sentence, (2) Trompetta provided "incentives and encouragement" for Nanai to testify against Gojcaj, and (3) Trompetta withheld exculpatory and impeachment evidence to which Gojcaj and his counsel were entitled.  (Am. Compl. ¶ 35.)  None of these actions can be

construed as extreme or outrageous.  Facilitating a prosecution is a primary function of law enforcement – none of the allegations suggest that Trompetta improperly did so.  In addition, the allegation that Trompetta "insisted" on a maximum sentence is conclusory – and not plausible, to the extent it suggests that Trompetta's views influenced the plea offer or the ultimate sentence, given the ordinary roles of the prosecutor and the court in the sentencing process.  The Amended Complaint does not state *how* Trompetta "insisted," whether his "insistence" was communicated to the judge, or what impact his "insistence" had.  Absent such details, the suggestion that he dictated the terms of the plea offer is implausible.  It is also not "outrageous conduct" for a police officer to share with a prosecutor his views as to an appropriate offer.   Finally, any improper "withholding" of impeachment or exculpatory evidence prior to trial would have been misconduct on the part of the prosecuting attorney, not Trompetta.  According to the Amended Complaint, the State's Attorney's Office was aware of the fact that Nanai received assistance in his parole application because prosecutors participated in rendering that assistance.  (*See* Am. Compl. ¶ 41 ("The State's Attorney's [O]ffice in Danbury, via one or more representatives, through and in connection with [Trompetta], had discussions about assisting Nanai with a Pardon Application prior to the time he testified at [Gojcaj's trials] . . .").)  The complaint pleads no facts suggesting that it was Trompetta's responsibility – or role – to share such evidence with Gojcaj or his counsel.

The fourth listed conduct, Trompetta's "intimidation tactics" during the trial in an effort to intimidate the jury – making gestures, whispering remarks, and laughing during closing arguments – may have been rude or unprofessional, but were not extreme or outrageous, and Gojcaj fails to plead any facts suggesting how such courtroom antics might have intimidated jurors.  *See, e.g.*, *Winter v. Northrup*, 334 Fed. App'x 344, 347 (2d Cir. May 29, 2009) (affirming

dismissal of Connecticut law IIED claim because the defendant's conduct, "while potentially insulting and unprofessional, is not so atrocious as to exceed all bounds usually tolerated by decent society, and is therefore insufficient to form the basis of an action for [IIED]" (citation and internal quotation marks omitted)); *Menon v. Frinton*, 170 F. Supp. 2d 190, 198 (D. Conn. 2001) ("[To prevail on an IIED claim], [t]he disputed conduct must exceed all bounds tolerated by decent society, and cannot be merely rude, tactless or insulting." (citation omitted)).

Finally, Gojcaj's allegation that Trompetta enlisted other police officers to intimidate and harass Gojcaj and his family during the trials does not state an IIED claim.  Gojcaj first contends that he was pulled over in Danbury, on pretextual grounds, during his trials.  This allegation is inconsistent with the other information alleged in the complaint; Gojcaj could not have been pulled over during either criminal trial because he was incarcerated at that time.  Second, Gojcaj alleges that Trompetta caused Gojcaj's family to be pulled over in Danbury during the trial on pretextual grounds.  Whether or not this would amount to outrageous conduct, Gojcaj lacks standing to assert a claim against Trompetta for actions he caused to be taken against Gojcaj's family.  *Cf. Levy v. Kick*, No. 3:06-cv-390-PCD, 2007 WL 2492036, *4-5 (D. Conn. Aug. 30, 2007) (granting summary judgment in favor of officer with regard to a Fourth Amendment claim asserted by father of the individual involved in the traffic stop at issue because the father lacked standing).  It is possible that Gojcaj was injured by these actions because he felt threatened or intimidated as a result of the actions against his family.  But the Amended Complaint fails to allege facts suggesting this was the case.  The amended complaint only states, with regard to all of Trompetta's actions, "[a]s a direct and proximate result of Defendant [Trompetta]'s actions and omissions, [Gojcaj] suffered severe emotional distress, humiliation, embarrassment, fear, loss of appetite, loss of sleep, deprivation and loss of enjoyment and quality of life."  (Am.

Compl. Count Four ¶ 50.)  It does not suggest how or why Gojcaj was injured by his family being pulled over in Danbury during the trial.

Count Four is DISMISSED because it fails to state a plausible claim of IIED.

### E.  *Municipal Liability (Count Six)*

Defendants argue that Gojcaj's sixth count, which asserts supervisory and municipal liability against the Chief Baker and the City of Danbury under 42 U.S.C. § 1983, is time-barred and fails to state a claim.  Because I find that the allegations in the Amended Complaint fail to state a claim of supervisory or municipal liability, I need not address the timeliness argument, and dismiss Count Six.

Under Section 1983, a supervisor can be held liable for the unconstitutional actions of a subordinate "if he or she was personally a direct participant in the constitutional violation." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) (citations and internal quotation marks omitted).  "In this Circuit, a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally."  *Id.* (citations omitted).  The Amended Complaint makes no mention of Chief Baker's involvement in Trompetta's actions against Gojcaj.  Because it fails to allege any facts indicating that Chief Baker was a direct participant in any violation of Gojcaj's federal rights, the Amended Complaint fails to state a claim of supervisory liability against him.

Gojcaj asserts a municipal liability claim against the City, alleging that its failure to train or supervise its employees resulted in the deprivation of his federal constitutional rights.  A municipality can be held liable for failing to train its employees who commit constitutional violations when the "failure to train amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact."  *Walker v. City of New York*, 974 F.2d 293,

297 (2d Cir. 1992) (citation and internal quotations omitted).  "Deliberate indifference require[s]

that city policymakers made a deliberate choice from among various alternatives not to fully

train employees."  *Id.* at 297 (citation, internal quotation marks, and alterations omitted).

> In order to establish that a failure to train constitutes deliberate indifference to the
> constitutional rights of the public, a plaintiff must establish (1) that the
> policymaker knows to a moral certainty that his employees will confront a given
> situation; (2) that the situation either presents the employee with a difficult choice
> of the sort that training or supervision will make less difficult or there is a history
> of employees mishandling the situation; and finally (3) that the wrong choice by
> the city employee will frequently cause the deprivation of a citizen's
> constitutional rights.
>
> In addition to establishing that the purported failure to train occurred under
> circumstances that could constitute deliberate indifference, *City of Canton* [*v.
> Harris*, 489 U.S. 378 (1989)] requires that the plaintiff also identify a specific
> deficiency in the city's training and establish that the deficiency is closely related
> to the ultimate injury, such that it actually caused the constitutional violation.

*Odom v. Matteo*, 772 F. Supp. 2d 377, 402 (D. Conn. 2011) (citations and internal quotation

marks omitted).  The Supreme Court has cautioned that, given the "nebulous" nature of the

claim, a "municipality's culpability for a deprivation of rights is at its most tenuous where [the]

claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  "A failure-to-

train claim is properly dismissed where the complaint lacks enough factual material for the court

to reasonably infer that the police misconduct alleged was the result of anything other than the

individual acts of the arresting officers."  *Adams v. City of New Haven*, No. 3:14-cv-778-JAM,

2015 WL 1566177, *4 (D. Conn. April 8, 2015) (citation internal quotation marks, and

alterations omitted).

A municipality may also be held liable under a theory that it failed to supervise or

discipline subordinates who commit constitutional violations.  A plaintiff may establish such

liability by showing that a policymaker was "knowingly and deliberately indifferent to the

possibility that its police officers were wont" to commit such violations.  *Fiacco v. City of*

*Rensselaer*, 783 F.2d 319, 326 (2d Cir. 1986).  To demonstrate that a policymaker was deliberately indifferent to the need to supervise or discipline, a plaintiff must show "that the need for more or better supervision to protect against constitutional violations was obvious, but that [he or she] made no meaningful attempt to forestall or prevent the unconstitutional conduct." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) (citation and internal quotation marks omitted).

Gojcaj offers five areas in which deficient training or supervision caused him to be deprived of a federal right:

    a.  [F]ailure to adopt policies, procedures and/or practices that would prevent police officers from arresting and/or seeking arrest warrants without probable cause, omitting material truths in support of applications for arrest warrants, and retaliating against subjects of their investigations and arrests for pursuing their rights by way of a jury trial, when the need for such training/supervision, discipline and/or control was obvious;

    b.  failure to adopt policies, procedures and/or practices that would prevent police officers from [] utilizing their office to interfere with and/or retaliate against persons exercising their rights under the federal and state constitutions, when the need for such training/supervision, discipline and/or control was obvious;

    c.  failure to adequately train, supervise, discipline, and/or otherwise control police officers who exhibited tendencies to arrest and/or seek arrest warrants without probable cause, omit material truths in support of applications for arrest warrants, and retaliate against subjects of their investigations and arrests for pursuing their rights by way of a jury trial when the need for such training/supervisions, discipline and/or control was obvious;

    d.  failure to adequately train, supervise, discipline, and/or otherwise control police officers who exhibited tendencies to utilize their office to interfere with and/or retaliate against persons exercising their rights under the federal and state constitutions when the need for such training/supervision, discipline and/or control was obvious; [and]

    e.  failure to reprimand, discipline or otherwise take action against police officers engaged in unlawful conduct and violation of persons' rights under the federal and state constitutions; despite having prior notice that its officers engaged in such conduct.

(Am. Compl. Count Six ¶ 50.)

These conclusory allegations, without more, do not state a plausible Section 1983 "failure to train" claim. The Amended Complaint includes no factual allegations supporting a finding that any deficient training resulted in the violation of Gojcaj's constitutional rights. Nor are there factual allegations indicating that any of the city policymakers were on actual or constructive notice that "a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 60. In *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 533–41 (S.D.N.Y. 2012), the court dismissed a failure to train claim when the plaintiff's complaint similarly listed "systemic flaws" in the municipality's training system, such as, "[p]olice officers investigating incidents fail to include in their reports relevant factual information which would tend to contradict the statements of the police officer involved." Because the complaint's list of training deficiencies was "wholly conclusory," the court ruled that the claim could not survive a motion to dismiss in the absence of additional factual allegations that could "substantiate [those] allegations." *Id.* at 535; *see also id.* at 535 ("[M]ere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such custom unless supported by factual details."); *Missel v. County of Monroe*, 531 Fed. App'x 543, 546 (2d Cir. Nov. 4, 2009) (affirming dismissal of a failure to train claim because "the complaint does not contain any factual allegations to support these conclusory and speculative assertions [of insufficient training]; and the assertion that the County was aware of complaint about [an officer's past conduct] does not provide a plausible basis for an inference that the County failed to give [that officer] proper training as a County employee"). The court in *Adams* dismissed the plaintiff's failure to train claim for the same reason, explaining,

> Here, plaintiff's failure-to-train claim is not facially plausible.  Plaintiff has made no more than a general allegation that defendants "failed to adequately train and instruct [police] officers regarding the Fourth and Fourteenth Amendment rights of persons."  *While this assertion does specify what type of training the officers lacked, it does not provide any facts that would allow the court to infer what city policies, practices, or customs contributed to or caused the deficiency*.

2015 WL 1566177, at *4 (emphasis added) (citation and internal quotation marks omitted).

Gojcaj's Amended Complaint shares the same fatal flaw as the complaint discussed in *Adams*: while it lists the type of training the officers lacked, it alleges no facts indicating what city policies, practices, or customs contributed to the alleged lack of training.  Further, while it might be "obvious" that a municipality should train its officers to refrain from omitting material facts when offering an affidavit in support of an arrest warrant, it cannot be said that failure to train in this context would be "so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489 U.S. at 390.

Nor do the allegations state a claim for failure to supervise or discipline.  The Amended Complaint asserts no factual allegations supporting a finding that any city policymaker knew of Trompetta's – or any other employee's – unconstitutional conduct.  Nor does the Amended Complaint offer any factual allegations indicating that the need to supervise or discipline was so obvious that failure to do so would amount to deliberate indifference.  The absence of such allegations is fatal to a failure to supervise or discipline claim.  *See, e.g.*, *Missel*, 351 Fed. App'x at 546 ("Missel has made insufficient factual allegations that the County Defendants were on notice of and took no action in response to [the officer's] conduct, or that [the officer] had a history of such behavior that [the County] deliberately ignored."); *Pelt v. City of New York*, No. 11-cv-5633-KAM-CLP, 2013 WL 4647500, *16 (E.D.N.Y. Aug. 28, 2013) (dismissing a failure to discipline claim because, "[a]lthough Plaintiff broadly asserts that the City and NYCHA

maintain a policy and practice of failing to discipline municipal employees, Plaintiff fails to allege any facts to support these naked and speculative allegations, which amount to nothing more than threadbare recitals of the elements of a municipal liability claim").

Because the Amended Complaint offers only conclusory allegations in support of the municipal and supervisory liability claims, Count Six is dismissed.

### III.    Conclusion

For the reasons set forth above, I GRANT in part and DENY in part Defendants' motion to dismiss.  Counts Two, Three, Four, Five, and Six are dismissed with prejudice.  The Clerk is instructed to dismiss the City of Danbury and Chief Baker as defendants in this matter.

Within twenty-one days of this ruling, Defendants may submit a memorandum, no more than ten pages, as to whether the Amended Complaint fails to states a plausible claim for relief in Count One because it fails to suggest that Trompetta lacked probable cause of Gojcaj's guilt when signing the warrant affidavit.  If Defendants submit such a memorandum, Gojcaj may submit a response, also confined to ten pages, no later than twenty-one days after Defendants' submission.  No reply memoranda may be submitted.


IT IS SO ORDERED.


                                             /s/
                                    _____
                                    Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                January 5, 2016